# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **UNITED STATES OF AMERICA**, <br><br> v. <br><br> **DONZELL LORENZO DIXON**, <br><br> Defendant. | Case No. 1:18-cr-00358 (TNM) |

### MEMORANDUM OPINION

A federal grand jury indicted Donzell Dixon on counts of robbery; using, brandishing, and carrying a firearm during the robbery; and unlawful possession of a firearm by a convicted felon. To expedite the provision of discovery to Dixon while guarding the victim's privacy and safety rights, the Government has moved for a protective order to limit the viewing, use, dissemination, and post-litigation retention of police body-worn camera ("BWC") material. Because the Government has shown good cause, the Court will grant the motion.

### I.

Dixon was arrested in December 2018. *See* ECF No. 2. A "significant amount" of BWC video footage relevant to his case was captured by "numerous [police] officers." Gov't's Mot. for Protective Order Governing Body Worn Camera Materials ("Gov't's Mot.") at 2, ECF No. 8. The officers recorded "footage from the victim's report of the armed robbery the night of the incident, as well as footage from . . . the execution of the search warrant at the defendant's home approximately two days later." *Id*.

In the two months since Dixon's arrest, the parties have "attempted to come to a consensus on an appropriate protective order" for the BWC footage but "are at irreconcilable

odds on this issue." *Id*. at 1. The Government believes that a protective order is necessary to ensure the privacy and safety of the victim and "numerous civilian witnesses unrelated to this investigation." *Id*. at 2. Among other things, the proposed order:

- Precludes disclosure of the BWC material to anyone other than Dixon, his legal defense team, and people authorized by the Court;

- Requires defense counsel to ensure that neither Dixon nor anyone other than the legal defense team view any footage that includes personally identifying information about the victim or a witness; and

- Prohibits use of the BWC material in matters unrelated to this case.

*See* Protective Order Governing Discovery of Body Worn Camera Materials ("Protective Order"), ECF No. 8-1.

Dixon contests the need for this order. He suggests that "[v]ideo footage that captures the victim or shows civilian witnesses, without more, does not establish good cause for any special protection." Def.'s Opp. to Gov't's Mot. ("Def.'s Opp.") at 3, ECF No. 9. Both parties have submitted briefs detailing their arguments.[1]

## II.

Federal Rule of Criminal Procedure 16 governs discovery in criminal cases. Rule 16(a) requires the Government to produce, upon the defendant's request, any documents and data that

---

[1] During a February 4, 2019, Status Conference, the parties suggested that they are still negotiating and hope to reach a compromise about the BWC videos. But they also indicated a similar hope at the initial Status Conference nearly two months ago. The parties have filed memoranda that thoroughly brief their arguments. And the Speedy Trial Act imposes on the Court duties and responsibilities designed to protect Dixon's *and* the public's right to an expeditious disposition of his case. *See* 18 U.S.C. §§ 3161-3174. For these reasons, the Court finds it appropriate to resolve the impasse now, although this issue may be revisited once the defense evaluates the BWC material. *See* Protective Order at 5.

2

are material to preparing the defense. *See* Fed. R. Crim. P. 16(a)(1)(A)-(G). But upon a showing of good cause, courts may "deny, restrict, or defer discovery . . . or grant other appropriate relief." Fed. R. Crim. P. 16(d). This relief includes issuing protective orders. *See id*.

When the Government is seeking a protective order, it bears the burden of showing that good cause exists for its issuance. *See United States v. Johnson*, 314 F. Supp. 3d 248, 251 (D.D.C. 2018). Good cause requires a "particularized, specific showing." *United States v. Bulger,* 283 F.R.D. 46, 52 (D. Mass. 2012). But the level of particularity required depends on the nature and type of protective order at issue. *Id*.

In determining whether good cause exists, courts have considered whether (1) disclosure of the materials in question would pose a hazard to others; (2) the defendant would be prejudiced by a protective order; and (3) the public's interest in disclosure outweighs the possible harm. *See, e.g.*, *United States v. Smith*, 985 F. Supp. 2d 506 (S.D.N.Y. 2013). "Among the considerations to be taken into account by the court will be the safety of witnesses and others, a particular danger of perjury or witness intimidation, and the protection of information vital to national security." *United States v. Cordova*, 806 F.3d 1085, 1090 (D.C. Cir. 2015) (cleaned up).

Courts often issue protective orders in criminal cases. They have "vast" discretion to "assure that a defendant's right to a fair trial [is] not overridden by the confidentiality and privacy interests of others." *United States v. O'Keefe*, 2007 WL 1239204 at *2 (D.D.C. 2007). Indeed, courts "can and should, where appropriate, place a defendant and his counsel under enforceable orders against unwarranted disclosure of the materials which they may be entitled to inspect." *Alderman v. United States*, 394 U.S. 165, 185 (1969).

## III.

In weighing the need victim's and witnesses' need for a protective order against any prejudice to the Defendant or harm to the public that the order may cause, the Court considers two factors—the nature and circumstances of the alleged crime and the Defendant's criminal history. Considering the type of crime charged helps assess the possible threats to the safety and privacy of the victim. Defendants accused of securities fraud or shoplifting, for instance, may not pose as great a danger to victims as those charged with crimes of violence. Similarly, there may be greater privacy concerns when a defendant is alleged to have committed identity theft or counterfeiting.

Reviewing the defendant's criminal history can provide useful information as well. A long record of convictions for violent crimes may suggest a substantial danger to the safety of others. Similarly, a history of failures to follow court orders may justify a more restrictive protective order. By contrast, a first-time offender may be less likely to target his victim or the witnesses to his alleged crime.

Applying these factors, the Court finds that unrestricted disclosure of the BWC material would pose an unnecessary hazard to the victim and witnesses. And neither Dixon nor the public will be unduly prejudiced by the proposed order. So good cause exists to grant the Government's motion.

## A.

The victim of and witnesses to Dixon's alleged crime have substantial interests at stake. The BWC footage displays the victim's identity and face. Gov't's Mot. at 2. It also shows civilian witnesses who are "unrelated to this investigation." *Id*. One of these witnesses "reports

an unrelated crime" to the police while on camera. *Id*. Additionally, "BWC materials frequently, if not always, include personal identifying information" like names, driver's license numbers, personal phone numbers, and home addresses. *Id*. at 3. Officers responding to the report of an armed robbery will naturally ask the victim and any witnesses for this type of identifying information. These are "particularized" and "specific" examples of the sensitive data the Government seeks to protect. *Bulger,* 283 F.R.D. at 52. And they implicate privacy and safety concerns the Court cannot ignore.

Reflecting these concerns, federal law enumerates the rights of crime victims. *See* 18 U.S.C. § 3771. They have the right, for example, "to be reasonably protected from the accused," and to "be treated with fairness and with respect for [their] dignity and privacy." 18 U.S.C. § 3771(a). The Court has an obligation to "ensure that the crime victim is afforded [these] rights." 18 U.S.C. § 3771(b).[2] It must also consider the safety of the victim and the witnesses involved. *See Cordova*, 806 F.3d at 1090.

Here, these obligations strongly militate for the issuance of a protective order. The immediate aftermath of a violent crime is a traumatic and vulnerable time for a victim. Unfettered release of the footage capturing those moments would raise significant privacy concerns. And Dixon's purported conduct raises safety concerns that also justify protecting the BWC material.

---

[2] Like federal law, the District of Columbia's regulations require that "[a]ccess to the unredacted BWC recording [should] not violate the individual privacy rights" or "jeopardize the safety of any other subject." *See* D.C. Mun. Reg. 24 § 3902.5(a); *see also* D.C. Code § 23-1901(b) (the District's Crime Victim Bill of Rights, noting that crime victims have the right to "[b]e treated with fairness and with respect for [their] dignity and privacy").

Consider first the alleged crime. The victim was a driver who worked for GrubHub, a food delivery service. *See* Detention Mem. at 2, ECF No. 6.[3] According to the Government's allegations, one night, Dixon ordered food from a restaurant that used GrubHub's service. *Id*. The victim was dispatched to deliver the food. *Id*. When he arrived at the listed address, he could not find Dixon. *Id*. Dixon then called the victim's cellphone. *Id*. When the victim returned this call, Dixon asked him to "bring the food back to the apartment building." *Id*. The victim did so, but was still unable to find him. *Id*.

Then, as he was walking back to his car, Dixon approached the victim from behind and told him to "[p]ut the money down." *Id*. at 2-3. The victim turned around and saw that Dixon was holding a "black semiautomatic handgun" that he kept "low and close to his body." *Id*. at 3. At gunpoint, he emptied his pockets. *Id*. Dixon also "reached into [the victim's] front coat pockets to remove the rest of his property," including a cellphone, bank cards, and roughly five hundred dollars in cash. *Id*. After taking these items, Dixon "pointed the handgun at [the victim] and told him to run." *Id*.

In short, Dixon is alleged to have used personally identifying information—a delivery driver's cellphone number—to rob an innocent person at gunpoint. These facts distinguish this case from those involving nonviolent or victimless crimes, in which protecting personal information may not provide meaningful safeguards to others. In *United States v. Johnson*, for example, the defendant was charged with being a felon in possession of a firearm. 314 F. Supp. 3d at 250. The case involved no victims and no allegations of violence. *See id*. So in refusing to issue a protective order comparable to the one at issue here, the *Johnson* court did not consider

---

[3] For the limited purpose of evaluating the request for a protective order, the Court makes several findings of fact. These findings are based on the Pretrial Services Report, ECF No. 2, and the Magistrate Judge's findings of fact following a detention hearing. *See* ECF No. 6.

6

the Crime Victim Rights Act, 18 U.S.C. § 3771, nor the obligations it places on courts to protect victims and their privacy.  *See id*. at 257.  But it still prevented unrestricted release of BWC material, finding that "the government has shown good cause for prohibiting [the defendant] from disclosing the footage to the public at large."  *Id*.; *accord United States v. Kingsbury*, 325 F. Supp. 3d 158 (D.D.C. 2018) (issuing a limited protective order for BWC material in a prosecution for unlawful possession of cocaine with intent to distribute, felon in possession of a firearm, and possession of a firearm during a drug trafficking offense).

The surrounding circumstances also support a finding of good cause.  Investigating the armed robbery, police officers found a "black, semi-automatic Ruger P95 handgun with an extended magazine and a laser affixed to the barrel" in Dixon's bedroom.  Detention Mem. at 5.  They found the victim's bank card and Dixon's District of Columbia identification.  *Id*.  Later, while in custody, Dixon "admitted to having a gun in his room" and confessed "to calling [the victim] and then robbing him."  *Id*.  These facts suggest that narrowly designed limitations on Dixon's access to and use of the BWC material will not harm his efforts to prepare for trial.  And they add to the reasons justifying a concern for the victim's safety.

Like the nature and circumstances of the offense, Dixon's criminal history gives the Court cause for concern too.  He has three prior convictions and five prior arrests.  Pretrial Services Report at 1.  One of these convictions was for an attempted robbery.  *Id*. at 3.  Put simply, the Court finds that this history, his alleged crime, and the privacy rights at issue warrant protecting personally identifying information from disclosure to Dixon and the public.

His arguments to the contrary are unpersuasive.  He contends that the Government's "primary argument" for a protective order is based "solely on conjecture and speculation."  Def.'s Opp. at 3.  Not so.  The Government has provided particularized examples of the sensitive

material it seeks to protect. And, in any event, it is inevitable that BWC footage from multiple police officers responding to a crime of this type will capture personally identifiable information that should be treated with care.

Dixon also argues that video footage revealing the identity of civilian witnesses "without more, does not establish good cause for any special protection." *Id*. But he offers no authority or explanation in support of this proposition. And the Government *has* offered enough of a justification to find good cause—it believes that the privacy and safety rights of the victim and witnesses to this crime warrant protection. The Court agrees.

**B.**

While the Government has shown good cause for a protective order, Dixon's allegations of prejudice fall short. The proposed order allows him and his "legal defense team" to use the BWC material for all case-related purposes. Protective Order at 1-2. The legal defense team includes "counsel's immediate supervisor" and "investigators, paralegals, or support staff members . . . working under the direction of the defense counsel." *Id*. at 1. And most important, Dixon may seek a modification of the order at any time. *Id*. at 5.

Here too, Dixon's protestations lack merit. He suggests, for instance, that the proposed order does not allow defense counsel "to consult with other attorneys, including attorneys within the Federal Public Defenders (FPD) office who are not considered 'defense counsel's immediate supervisor,' about the protected materials." Def.'s Opp. at 5. But the order does not prohibit *discussing* relevant aspects of the BWC material with other lawyers. It merely requires Dixon to seek the Court's permission before *showing* the footage to people outside his legal defense team. Protective Order at 2.

Next, he objects to the order's requirements that the footage be used only for case-related purposes, and that it be destroyed or relinquished following a dismissal or acquittal. *See* Protective Order at 4; Def.'s Opp. at 6. Defense counsel argues that the videos "may be relevant in other cases being handled" by his office, and that his "colleagues . . . should be able to use the protected information in order to assist other clients." Def.'s Opp. at 6. He speculates that the footage may reveal "bias or misconduct that may be useful" for other litigation. *Id*.

Perhaps. But again, Dixon cites no authority supporting his contention that he has an unfettered right to government property in perpetuity and for any purpose. Nor is the Court aware of any obligation or right of FPD to develop a video library repository allowing it to act as an ombudsman of possible police misconduct.

Many courts in this district have, in fact, issued similar protective orders limiting criminal defendants' uses of sensitive discovery materials. *See, e.g.*, Consent Protective Order Governing Discovery of Body Worn Camera Materials, *United States v. Carr*, No. 17-230 (D.D.C. Feb. 9, 2018); Order Granting Mot. for Protective Order, *United States v. Drake*, No. 16-173 (D.D.C. Feb. 20, 2018). And federal law does not require the Government to grant access to these records indefinitely. *See* 44 U.S.C. § 3302-14 (articulating procedures governing the disposal of records). Law enforcement agencies and other government bodies routinely destroy outdated records; the FPD has no obvious right to do otherwise.

Dixon also challenges the limits the order places on his ability to view the footage. Def.'s Opp. at 6-7. He suggests that these restrictions may hinder his ability to participate meaningfully in his own defense. Def.'s Opp. at 6-7. But under the clear terms of the proposed order, defense counsel "may authorize the viewing of BWC materials" by the Defendant. Protective Order at 2. To do so, counsel needs to ensure only that he withholds sensitive or

personally identifying information about witnesses from Dixon. There is nothing *per se* improper with limiting the material defense counsel can provide to his client. *See, e.g., Cordova*, 806 F.3d at 143-44 (finding no prejudice in district court's protective order prohibiting defendants from keeping Jencks Act paperwork in their possession).

This requirement would allegedly "shift[] an enormous burden onto defense counsel to identify the information that the government might consider sensitive and want protected." Def.'s Opp. at 8. Dixon believes the Government "seeks to use its duty of providing prompt discovery . . . as an excuse to saddle defense counsel with the tedious task of reviewing and redacting BWC videos." *Id*.

Quite the opposite—it is defense counsel's approach that would drown the Government in needless reviewing and redactions. True, the protective order requires defense counsel to redact portions of any BWC material he wants to show his client. And if Dixon seeks to watch several hours of the footage, these redactions would indeed involve a degree of tedium. But it would be tedious for the Government to review and redact this footage too. And defense counsel is in the best position to efficiently determine which footage is most relevant for his client's review. Indeed, he is the only one who can do so.

A simple example demonstrates this point. The Government represents that "numerous officers" were involved in the execution of a search warrant at Dixon's home. Gov't's Mot. at 2. And the BWC material includes footage from these officers' cameras. *Id*. It is thus likely that much of this footage captures the same police activity from different angles. The same is almost certainly true of the officers' interactions with the victim on the night of the robbery. Surely the defense counsel has no intention of showing all these duplicative videos to his client—with or without redactions. He can determine what videos or portions of videos are most relevant for his

client's viewing and redact any protected information from those parts. But the Government cannot make any such editorial decisions. The prosecutor would be forced to redact any personally identifiable information from all videos—including those that the defense counsel has no intention of showing Dixon—before releasing it to the Defendant.

In other words, forcing the Government to perform this review would cause a "substantial [and unnecessary] delay" in disclosure. Gov't's Mot. at 4. Such a delay is inconsistent with rules requiring efficient and expeditious discovery. Local Criminal Rule 5.1(a), for instance, requires the Government to "make good-faith efforts" to disclose information that could be favorable to the accused "as soon as reasonably possible after its existence is known, so as to enable the defense to make effective use of the disclosed information in the preparation of its case." LCrR 5.1. Similarly, Federal Rule of Criminal Procedure 16(d) grants the Court considerable discretion to regulate discovery, and protective orders are a useful tool for "expediting the flow of pretrial discovery materials." *Bulger*, 283 F.R.D. at 53.

True, in *Johnson*, the court placed the burden of redacting the BWC materials on the Government. 314 F. Supp. 3d at 252-53. But there, "the government ha[d] not explained why its attorneys [were] any less capable of reviewing the footage and redacting sensitive information than" the defendant's attorney. *Id*. at 253. The court also found that it would likely be more efficient for the Government to review the BWC videos at issue. *Id*. It noted that the Government's lawyer could simply "confer with the officer who wore the body camera to determine whether the footage contains sensitive information." *Id*.

By contrast, here the Government would have to review footage from multiple officers. Gov't's Mot. at 2. And the videos depict "numerous civilian witnesses," "the victim's report of the armed robbery [on] the night of the incident," and "the execution of the search warrant" at

Dixon's home two days later. *Id*. Thus here, unlike in *Johnson*, the Court finds that defense counsel is in the best position to efficiently identify and sanitize the footage that Dixon should review.[4]

### C.

Lastly, the Court finds that any public interest in the BWC material will not be harmed by issuing the protective order. The District of Columbia has created a process for the public release of this footage. *See* D.C. Act 21-265 (2016). These regulations allow the public to request BWC recordings and give the Metropolitan Police Department 25 days to respond to requests. *Id*. The proposed order also excludes any materials that are received as evidence in trial, or that are otherwise made part of the public record. Protective Order at 4.

But issuing a protective order is the only way to avert the possible harm to the victim and witnesses of having their names, faces, and other personally identifying information released. Because release of this information would pose a hazard to these individuals, and because protecting this information will not harm Dixon or the public, the Court will enter the Government's proposed order.

---

[4] Although there are of course different constitutional and regulatory regimes at work in the civil discovery context, such efficiency considerations are also applicable there. *Cf. Zubulake v. UBS Warburg LLC*, 217 F.R.D. 309, 318 (S.D.N.Y. 2003) (noting that "cost-shifting" may be considered when discovery "imposes an 'undue burden or expense' on the responding party," and that a burden is "'undue' when it 'outweighs its likely benefit, taking into account the needs of the case, the amount in controversy, the parties' resources, the importance of the issues at stake in the litigation, and the importance of the proposed discovery in resolving the issues) (quoting Fed. R. Civ. P. 26(b)).

## IV.

For these reasons, the Government's Motion for a Protective Order will be granted, although defense counsel may seek a modification of this order once he has evaluated the material. A separate order accompanies this memorandum.

Dated: February 8, 2019                                             TREVOR N. McFADDEN, U.S.D.J.